Craig S. Hilliard, Esq.
STARK & STARK
A Professional Corporation
993 Lenox Drive, Bldg. 2
Lawrenceville, NJ 08648-2389
(609) 895-7346
*Attorneys for Plaintiff, Mon Cheri Bridals, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MON CHERI BRIDALS, LLC, | DOCKET NO. 3:14-cv-08107-MAS-LHG |
| Plaintiff, | Civil Action |
| vs. | |
| TONY BOWLS, | |
| Defendant. | |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF MON CHERI BRIDALS, LLC'S APPLICATION FOR TEMPORARY RESTRAINTS AND A PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 4

LEGAL ARGUMENT .......................................................................................... 22

    I.    Mon Cheri Is Entitled to a Preliminary Injunction ............................ 23

        a.    Failure to Grant Mon Cheri's Application Will Result in
             Irreparable Harm ....................................................................... 23

        b.    Mon Cheri has Shown a Reasonable Probability of Success
             on the Merits ............................................................................. 25

        c.    Granting Injunctive Relief Would Not Result in Irreparable
             Harm to Bowls .......................................................................... 27

        d.    Public Interest Clearly Favors Granting Injunctive Relief
             to Mon Cheri ............................................................................. 27

CONCLUSION ..................................................................................................... 29

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE**

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153 (3d Cir. 1999)..........................23
*Arch Pers. Care Prods., L.P. v. Malmstrom*, 90 Fed. Appx. 17 (3d Cir. 2003) ........................22
*Atlantic City Coin  Slot Co., Inc. v. IGT*, 14 F. Supp.2d 644, 667 (D.N.J. 1998)......................24
*Bioquell, Inc. v. Feinstein,* 2011 U.S. Dist. LEXIS 16081 (E.D. Pa. Feb. 14, 2011)...............28
*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254 (3d Cir. 2000) ....................22
*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86 (3d Cir. 1992)...........................................23
*Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F. Supp. 233 (D.N.J.1976) ......................24
*Citizens Coach Co. v. Camden Horse R.R. Co.*, 29 N.J. Eq. 299, 305 06 (E. & A. 1878).........26
*Connors v. Shannopin Mining Co.*, 675 F. Supp. 986 (W.D. Pa. 1987)....................................22
*Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir. 1980)..................23
*Crowe v. DeGioia*, 90 N.J. 126 (1982)........................................................................................25
*H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987).......................26
*Hamilton Watch Co. v. Benrus Watch Co., Inc.*, 206 F.2d 738 (2d Cir. 1953) .........................25
*Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186 (3d Cir. 1990)........................................23
*In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137 (3d Cir. 1982)........................23
*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) ........................23
*Jiffy LubeInt'l v. Weiss Bos.*, 834 F. Supp. 683 (D.N.J. 1993)..................................................23
*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)...............................................23
*Local 397, International Union of Electronic, etc. v. Midwest Fasteners, Inc.*,
    763 F. Supp. 78 (D.N.J. 1990).............................................................................................28
*Maldonado v. Houstoun*, 157 F. 3d 179 (3d Cir. 1998)..............................................................23
*Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*, 2007 U.S. Dist. LEXIS 65792
    (D.N.J. Sept. 6, 2007) .........................................................................................................26
*Nutrasweet Co. v. Vit-Mar Enters.*, 176 F.3d 151 (3d Cir. 1999) .................................23, 25, 27
*Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989)...........................................24
*Peters v. Public Service Corp. of N.J.*, 132 N.J. Eq. 500 (Ch. 1942) ........................................24
*S&R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir. 1992)...........................23, 24
*Score Board v. Upper Deck Co.*, 959 F. Supp. 234 (D.N.J. 1997).......................................28, 29
*Siemens Building Technologies, Inc. v. Camacho*, 168 F. Supp. 2d 425 WL 395294,
    *2 (E.D. Pa. 2001) ..............................................................................................................28
*Sunbeam Corp. v. Windsor-Fifth Avenue*, 14 N.J. 222, 233 (1953) ..........................................24
*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ..............................................................23


**RULES**                                                                                                    **PAGE**

*Fed. R. Civ. P.* 65(a) ...................................................................................................................22

## PRELIMINARY STATEMENT

This action seeks to prevent the unlawful, early termination of a license agreement. Plaintiff, Mon Cheri Bridals, LLC ("Mon Cheri") is a Trenton-based manufacturer of fine formalwear, including wedding gowns, prom dresses and evening dresses. Ten years ago, Mon Cheri hired a retailer from Arkansas, defendant Tony Bowls ("Bowls"), to design its line of pageant dresses. At the time, Bowls was completely unknown and untried as a designer, but with the resources of Mon Cheri behind him, and (to his credit) his own skill set, Bowls became known in the industry as a designer of pageant, prom and evening dresses.

In October 2011, after Mon Cheri had already invested millions in the development of the Tony Bowls/Mon Cheri brand, Mon Cheri and Bowls entered into a new 10-year license agreement (the "License Agreement"), under which: 1) Bowls gave Mon Cheri an exclusive, world-wide license to use his name for the continued manufacture and sale of pageant, prom and evening dresses under the Tony Bowls/Mon Cheri brand; and 2) Mon Cheri agreed to pay royalties to Bowls on the sale of those dresses. At the same time, the parties entered into a 10-year employment agreement, under which Bowls agreed to devote his full time to the design of dresses for Mon Cheri and to support the company's efforts to market those dresses.

After these agreements were signed, Mon Cheri continued to invest a substantial part of the company's resources in the further growth of the Tony Bowls/Mon Cheri brand, which included the "Tony Bowls Paris" and "Tony Bowls Le Gala" line of prom dresses. A great deal of the company's reputation in the industry springs from the stability of its brands, and the "Tony Bowls" line of formalwear has been one of the company's flagship divisions for nearly a decade.

Despite the fact that the parties agreed on a license and employment relationship through 2021, the relationship between Bowls and Mon Cheri took an unfortunate turn in the Spring of

1

2014. That turn was surprising to Mon Cheri, because the relationship to that point had proved to be a profitable one for both Bowls and Mon Cheri. Yet, Bowls became increasingly dissatisfied with the company's understandable desire to control costs, and he deliberately flaunted his responsibilities as an employee to follow basic budget constraints set by the company. Moreover, he railed at Mon Cheri's efforts to direct the marketing of the dresses, even though he had agreed in writing in his employment contract to allow Mon Cheri to make all final decisions concerning the marketing and promotion of the dresses. Nevertheless, in an effort to appease Bowls and maintain a good working relationship, Mon Cheri agreed to hire Bowls' own choice for a "Branding Manager", to assist Bowls in the development of social media and internet marketing strategies ostensibly to improve the Tony Bowls/Mon Cheri brand. Mon Cheri retained the services of Bowls' own hand-picked manager, Steven Roddy, in April 2014. It did not take long before even Roddy fell out of favor with Bowls, because he dared to disagree with Bowls' desire to emphasize his own name and image at the expense of Mon Cheri, even though that was not the fundamental premise of the contractual relationship.

Even though Roddy developed social media strategies to use the strength of Mon Cheri's name to drive the further development of Bowls' own name and image, and thus drive the license relationship to more profitable heights for Bowls, Bowls saw it differently. He embarked on a series of actions which not only breached his employment contract, but undermined Mon Cheri's business as well. Among other things, he suddenly stopped designing for upcoming seasons without even telling the company, which is threatening the reputation of the company with its vendors, retailers and customers. He terminated his employment contract in September 2014, and on October 10, 2014, he issued a "notice" purporting to terminate the License Agreement. His *only* asserted grounds for this termination "notice" (and, therefore, the only issue currently being

litigated), is Mon Cheri's alleged failure to market prom and pageant dresses in a manner "using" the Tony Bowls trademark. This allegation, as demonstrated from the proofs submitted on this application, is insupportable. Mon Cheri indeed markets and sells prom and pageant dresses "using" the Tony Bowls trademark, and it has been doing so for years, driving over $250,000 in royalty revenue each year into Bowls' pocket. In reality, Bowls is simply looking for a way out of the License Agreement, and has manufactured a set of "breach" claims to fuel his exit strategy.

On November 7, 2014, Mon Cheri filed an Order to Show Cause application for Temporary Restraints and a Preliminary Injunction before the Honorable Paul Innes, P.J.Ch. in the Superior Court of New Jersey. Bowls' counsel received a copy of the application for restraints when it was filed, but for whatever reason he chose not to submit any papers in opposition to the application, or request a hearing. Accordingly, on December 3, 2014, Judge Innes entered the Temporary Restraining Order (the "TRO") and set the return date for the preliminary injunction hearing for February 13, 2015. Bowls filed a motion to vacate the TRO on December 18, 2014, which was heard and decided by Judge Innes on December 22, 2014. After hearing oral argument, Judge Innes denied Bowls' motion, extended the TRO until the February hearing date and ordered expedited discovery, per the parties' mutual requests. In reaching his ruling, Judge Innes considered each of the traditional factors for the issuance of injunctive relief -- including irreparable harm -- and concluded that the factors weighed in favor of continuing the temporary restraints. In essence, Judge Innes converted the TRO into a preliminary injunction by conducting such an in-depth analysis. Following Judge Innes' ruling in Mon Cheri's favor, Bowls removed the case to this Court on December 30, 2014.

The sudden termination Bowls seeks would have a devastating and irreparable impact on

Mon Cheri.  For the reasons outlined below, this Court should preliminarily enjoin Bowls from: 1) terminating, or taking any steps to terminate, the License Agreement; 2) making or disseminating, or causing to be made or disseminated, any statement (including, but not limited to, any statement to vendors, retailers, customers, media or the general public) stating, implying or suggesting that the License Agreement has been, or will be, terminated; and 3) taking any action which interferes, directly or indirectly, with Mon Cheri's rights as a party to the License Agreement.  This is not drastic relief.  It merely preserves, for a final hearing, the respective positions of the parties which existed at the time Bowls issued his "Termination Notice".

## STATEMENT OF FACTS

In 1991, Stephen N. Lang ("Lang"), CEO of Mon Cheri, began the company out of his home, and over the last 25 years the company has grown to be one of the most well known makers of formalwear in the industry. *See* Certification of Stephen N. Lang ("Lang Certification") at ¶¶ 1 and 4.  From its beginnings, Mon Cheri has been based right here in Trenton, New Jersey. *See* Lang Certification at ¶ 4. Today, Mon Cheri is one of the largest manufacturers and wholesalers of wedding dresses and social occasion wear in the United States. Mon Cheri, through its creative design team, has developed many of the world's most unique and original wedding and social occasion dress patterns. *See* Lang Certification at ¶ 3. Mon Cheri manufactures and sells bridal gowns, prom dresses, "mother of the bride" dresses, children's formalwear, evening gowns and other social occasion dresses, pageant dresses, shoes and related accessories. *See* Lang Certification at ¶ 5.

Over the years, Mon Cheri has engaged a number of different designers to create the company's different dress lines. In some instances, the designer was already well known in the industry when Mon Cheri engaged the designer. Jim Hjelm is an example of such a designer.

4

Mr. Hjelm had been well known in the industry for decades (he designed the wedding gown for President Nixon's daughter), and he left his position with a competitor and joined Mon Cheri several years ago. He now designs wedding gowns for the company under the name "James Clifford". *See* Lang Certification at ¶ 6. By contrast, Bowls was not a known designer in the industry when Mon Cheri hired him in 2005. In or around 2004, Lang met Bowls, while Bowls was the owner of a single retail dress shop in Little Rock, Arkansas. Lang learned of Bowl's skill set and his interest in doing design work, and they eventually struck an agreement in February 2005 for Bowls to become the designer of Mon Cheri's pageant dress line. A few seasons later, Lang expanded Bowls' design responsibilities to include Mon Cheri's prom line. *See* Lang Certification at ¶ 7.

In or around October 2011, Mon Cheri and Bowls entered into new contracts, which replaced earlier agreements signed in 2008. Mon Cheri and Bowls entered into an Employment Agreement, as well as a License Agreement. *See* Lang Certification at ¶¶ 8 and 9. Under the terms of the License Agreement, Bowls granted a license to Mon Cheri to sell the dresses under the mark "Tony Bowls" (the "Licensed Trademarks"). The license is in effect through October 2021.  In return for that license, Mon Cheri pays Bowls royalties on the sale of dresses under the Licensed Trademarks. *See* Lang Certification at ¶ 9.  Those royalties continue to be paid to this day.

Since 2008, Mon Cheri has invested millions of dollars manufacturing, advertising and marketing the company's prom and pageant lines under the "Tony Bowls" name. Mon Cheri markets and sells dresses under the "Tony Bowls" trademark throughout the United States, as well as in over 80 countries around the world. Through the time and money invested by Mon Cheri, the "Tony Bowls" brand has grown and Bowls himself has achieved a notoriety that he

would likely not have achieved but for Mon Cheri's significant investment. Mon Cheri has supported the growth of Bowls' name and brand since the very beginning. *See* Lang Certification at ¶ 10.

As evidence of Mon Cheri's continued support of Bowls' name and brand, it permitted Bowls to hire Steven Roddy as "Tony Bowls Brand Manager" in April 2014. *See* Certification of Steven Roddy ("Roddy Certification") at ¶ 8. Roddy is engaged in the business of providing internet and social media marketing and consulting services to clients. Several years ago, he formed and operated his own internet marketing company. Roddy also launched a website, www.thepageantplanet.com, which is an online pageant coaching service designed to assist young women to successfully compete in pageantry. *See* Roddy Certification at ¶ 2. Roddy first met Bowls in or around 2011 at the Miss America Pageant in Las Vegas. At the time, he understood Bowls was a designer of pageant dresses. *See* Roddy Certification at ¶ 3.

In July 2013, Roddy sent Bowls an email to tell him about a particular digital application that he had developed (commonly known as an "app") called "reservethedress", which helps teenage girls "reserve" online their prom dresses so that other young ladies do not purchase the same dress. *See* Roddy Certification at ¶ 4. In February 2014, Bowls called Roddy to tell him that he had been looking at the "reservethedress" app and that Bowls was impressed by Roddy's idea, the functionality of the app and the consumer following it generated. Roddy told him that a key feature of the app was its ability to collect data from the young ladies who used it, to track which styles were being purchased and in which geographic locations they were being purchased. Roddy told Bowls that Bowls could actually use the app to do research on his competition. Bowls then asked Roddy if Roddy would pay Bowls a commission if he could sell the app through his contacts with retail stores selling his dresses. When Roddy told him that the

6

product was not positioned to be sold that way, Bowls then asked Roddy if he would be interested in selling the app to Bowls. *See* Roddy Certification at ¶ 5.

After that phone conversation in February 2014, Bowls contacted Roddy several times in the succeeding weeks. Bowls eventually asked Roddy if he would be interested in helping Bowls to market his "Tony Bowls" name as Bowls' brand manager. Bowls told Roddy that he was doing work for Mon Cheri for its prom and pageant lines, which he claimed generated about 60% of Mon Cheri's sales. Roddy agreed to put together a "promotional" piece to present to Bowls. After Roddy prepared it, Bowls told Roddy that he wanted him to travel to Trenton, New Jersey to make the presentation to Mon Cheri. *See* Roddy Certification at ¶ 6. Roddy travelled to New Jersey in or around March 2014 and delivered a PowerPoint presentation to Mon Cheri's executives, including Lang. The entire focus of the PowerPoint presentation was on the ways in which Roddy believed that better use of social media channels, such as Facebook, Vine, Twitter and Instagram, as well as other digital and internet strategies, could improve and grow the "Tony Bowls" brand for the benefit of both Bowls and Mon Cheri. *See* Roddy Certification at ¶ 7.

Following this meeting, Lang advised Roddy that Mon Cheri wished to retain his services, and that he would be reporting and taking direction primarily from Bowls. Roddy was engaged as an independent consultant, and was paid by Mon Cheri. Roddy agreed to move from Ohio to Philadelphia to start his work. *See* Roddy Certification at ¶ 8. Over the next several months, Roddy developed new branding strategies for Bowls and the prom, evening and pageant lines he was designing under the Mon Cheri banner. *See* Roddy Certification at ¶ 9.

Mon Cheri has paid all royalties due to Bowls arising under the License Agreement. Additionally, Mon Cheri has otherwise performed, in good faith, its obligations to make and market the dresses to customers around the world. *See* Lang Certification at ¶ 11. Despite Mon

Cheri's enormous investment in the license, Bowls is now seeking to terminate it, *seven years* before the License Agreement ends. Such a termination would cause substantial, irreparable harm to the company. *See* Lang Certification at ¶ 12.

On October 10, 2014, Bowls' counsel delivered a letter to Mon Cheri's counsel, alleging that Mon Cheri had breached the License Agreement, and notifying Mon Cheri that Bowls was terminating the License Agreement on 30 days' notice, effective November 10, 2014. *See* Lang Certification at ¶ 13. The Termination Notice came on the heels of a separate letter from Bowls dated September 16, 2014, under which Bowls voluntarily resigned from his employment under the Employment Agreement. *See* Lang Certification at ¶ 14. In the Termination Notice, Bowls claims that Mon Cheri breached the License Agreement by marketing prom and pageant dresses in a manner "not using the Licensed Marks." *See* License Agreement, ¶ 7.3(a)(v). He identifies 7 different sets of facts that he contends support his allegation that Mon Cheri is not marketing dresses properly using his name, thereby entitling him to terminate that contract as of November 10, 2014. *See* Lang Certification at ¶ 15. None of these facts demonstrates a basis for termination.

First, the Termination Notice alleges that Mon Cheri breached the License Agreement by launching a Facebook account for the prom line under Mon Cheri's name. Roddy created that Facebook account, and his goal was to improve and grow the Tony Bowls Paris and Tony Bowls Le Gala prom lines. No one on the management team at Mon Cheri directed Roddy to create the Facebook account in this fashion. He did so on his own, as Bowls' Brand Manager, because he believed it was consistent with his efforts to promote the Tony Bowls prom lines. Importantly, on the home page of the account, Tony Bowls is listed as Mon Cheri's licensor, and the *only* prom designer for Mon Cheri. Each and every photo of a dress is a Tony Bowls design. No other

designers are listed or displayed. In any event, Bowls locked Roddy, and all Mon Cheri employees, out of his Facebook page somewhere between October 14 and October 17, 2014. *See* Roddy Certification at ¶ 19.

Second, the Termination Notice further charges that Mon Cheri breached the License Agreement by using the Twitter name @moncheriprom to promote the sale of prom dresses. As with the Facebook account, Roddy created that Twitter name, and his goal was to improve and grow the Tony Bowls Paris and Tony Bowls Le Gala prom lines. No one on the management team at Mon Cheri directed Roddy to create the Twitter name in this fashion. He did so on his own, as Bowls' own hand-picked Brand Manager, because he believed it was consistent with his efforts to promote the Tony Bowls prom lines under the Mon Cheri banner. Moreover, Bowls and Roddy discussed the prospect of purchasing a domain, PromWeekly.com, which obviously does not contain Bowls' name. That night, Roddy purchased PromWeekly.com and he advised Bowls of its purchase the next morning. The use of Twitter has been enormously successful in driving traffic which only promotes Tony Bowls and his dress lines. *See* Roddy Certification at ¶ 20.

Third, the Termination Notice also charges that Mon Cheri breached the License Agreement by relaunching an Instagram account for MONCHERIPROM. Roddy had to relaunch the MONCHERIPROM account because on or about September 1, 2014, Bowls changed the password on the TONYBOWLS Instagram account to lock Roddy, and all Mon Cheri employees, out. Additionally, Bowls was not following best practices for social media, and was engaged in a number of actions injurious to Mon Cheri's brand (not to mention his own), including postings to the account which: 1) misspelled "Miss America"; 2) misspelled the name of the first runner up to Miss America; and 3) misspelled his own name. Bowls also removed

Mon Cheri from his descriptions and tags, and was posting pictures without the appropriate Mon Cheri branding. Some of these pictures were copied from Mon Cheri Prom and reposted on his personal Instagram account.

Fourth, the Termination Notice alleges that Mon Cheri breached the License Agreement by registering the domain www.moncheriprom.com. Roddy created that web domain, and his goal was to improve and grow the Tony Bowls Paris and Tony Bowls Le Gala prom lines. No one on the management team at Mon Cheri directed Roddy to create the domain in this fashion. Roddy did so on his own, as Bowls' own hand-picked Brand Manager, because he believed it was consistent with his efforts to promote the Tony Bowls prom line. *See* Roddy Certification at ¶ 21.

Although Bowls now appears to be claiming that the use of a website without his name in the domain is somehow wrong, that is exactly what Bowls and Roddy discussed doing back in April 2014. In April, Bowls and Roddy specifically discussed the registration of a new site to promote prom in the same way Roddy's site www.thepageantplanet.com was used to promote pageantry. With Bowls present, Roddy called and registered the site www.promweekly.com with GoDaddy. Roddy told Mon Cheri's marketing team that he had registered the site. Bowls fully supported the registration of this site, and Roddy reminded him about it when Bowls complained about www.moncheriprom.com. *See* Roddy Certification at ¶ 22.

Fifth, Bowls alleges that Mon Cheri breached the License Agreement by including a single statement on its website, www.moncheribridals.com, which refers to "other prom designers". *Nothing else* in Mon Cheri's website, nor in any other marketing or advertising produced by the company, promotes any prom designer other than Bowls. In fact, on the page of the website on which this lone statement appeared, a user who clicks on the "prom" link next to

10

the statement sees only Bowls' name and only Bowls' designs. *See* Lang Certification at ¶ 16. Lang did not become aware of this single statement on the website referring to "other prom designers" until he read the Termination Notice from Bowls' counsel. Lang investigated the source of the statement, and learned from his staff that it was a "leftover" from content several years ago (before Bowls became the exclusive prom designer for the company), and it was simply an oversight that it had not been changed. After receiving the Termination Notice, Lang directed his staff to immediately remove the statement, which has been done. *See* Lang Certification at ¶ 17. Notably, this statement had been on the company's website for years, but Bowls *never* complained to Lang about it, or suggested that it was a violation of the License Agreement. *See* Lang Certification at ¶ 18.

Sixth, the Termination Notice alleges that Mon Cheri breached the License Agreement in connection with a registration renewal filed in the U.S. Patent & Trademark Office *over three years ago* by Mon Cheri, for the mark "Le Gala by Mon Cheri". At the time this registration was renewed, the mark was still in use, and it was used with Bowls' knowledge to market Mon Cheri's prom line of dresses. At that time, Mon Cheri and Bowls were in the process of repositioning the "Le Gala" brand, which ultimately became "Tony Bowls Le Gala". Moreover, this renewal application was filed and granted *before* Mon Cheri and Bowls even entered into the License Agreement. *See* Lang Certification at ¶ 19.

Finally, the Termination Notice alleges that Mon Cheri has recently failed to take steps to protect the "Tony Bowls" mark in connection with a pending lawsuit in the U.S. District Court for the District of New Jersey. This allegation is not correct. This lawsuit (along with several others) was filed by ABPIA, a trade association of which Lang is President (and Mon Cheri a member) and whose purpose is to stop the rampant counterfeiting of dresses on internet websites.

11

The Licensed Marks are not expressly listed in the chart of trademarks contained in the Complaint filed in that lawsuit because that chart was limited to those marks owned by the named plaintiffs, including Mon Cheri. Mon Cheri does not own the "Tony Bowls" mark. In fact, under paragraph 8.3 of the License Agreement, Mon Cheri has no obligation to enforce any infringement of the "Tony Bowls" mark. *See* Lang Certification at ¶ 20. Nevertheless, the "Tony Bowls" mark has been the subject of vigorous efforts by ABPIA and Mon Cheri to protect it from counterfeiting, and Bowls has been well aware of all of those efforts for the last two years. Lang has made numerous public announcements at markets and in other venues about the work of ABPIA, including at events attended by Bowls. He has never once objected to the efforts of Mon Cheri and ABPIA to protect the trademarks under which the dresses he designs are sold. *See* Lang Certification at ¶ 21.

The lawsuits in New Jersey have led collectively to the disabling of nearly 1,500 websites and countless URLs which include thousands of images of Tony Bowls dresses sold by Mon Cheri. Moreover, ABPIA has engaged (at considerable expense) the services of MarkMonitor, one of the leading online brand protection companies, to scour the internet and aggressively take action against the unauthorized use of the brands sold by ABPIA members, which include the "Tony Bowls" line of dresses. According to a report from MarkMonitor, which specifically shows the number of "enforcements" (i.e. URL takedowns), *over 20,000* images of "Tony Bowls" dresses have been removed from counterfeit sites on the internet. These actions obviously benefit both Mon Cheri and Bowls. Even though there is nothing in the License Agreement that obligates Mon Cheri to spend money to pursue counterfeiters selling "knockoffs" of products bearing the Tony Bowls trademark, the fact is that Mon Cheri *is* proactively taking such steps, spending company money to do so. Remarkably, Bowls contributes nothing to the

ABPIA efforts, yet receives the benefits of Mon Cheri money and ABPIA's efforts to police the unauthorized use of his name. In contrast, at least one other Mon Cheri designer has contributed to the anti-counterfeiting campaign, and all of the designers support the program. *See* Lang Certification at ¶ 22.

Bowls is now seeking to terminate the License Agreement based on these unfounded assertions that Mon Cheri is not properly marketing prom and pageant dresses under the "Tony Bowls" mark, and is not taking proper steps to protect the license. These assertions are not accurate, and they certainly do not demonstrate that Mon Cheri is in violation of the License Agreement. *See* Lang Certification at ¶ 23. In contrast, Bowls has taken a number of actions over the last several months which Mon Cheri believes will demonstrate to the Court that he has been planning for many months to try and extract himself early from the License Agreement. *See* Lang Certification at ¶ 24.

In the last several months, Bowls has failed to complete basic steps he was obligated to take as a designer of the prom line. He has failed to make necessary corrections to dresses, which have been accepted onto the line and are shipping soon for the Spring 2015 season, even though he was obligated to do so under paragraph 1.B. of the Employment Agreement. This has caused Mon Cheri to scramble to make the necessary corrections without the help of the designer, which has cost the company considerable time and money and has threatened the timely delivery of dresses to the stores for the upcoming season. *See* Lang Certification at ¶ 25. Moreover, Bowls stopped submitting sketches to the factories many months ago, long *before* he terminated his employment in September 2014, and *before* he sent the Termination Notice. *See* Lang Certification at ¶ 26. Once again, these were his most basic obligations of his employment, as outlined in paragraph 1.B. of the Employment Agreement. After Lang received the Termination

Notice, he contacted his factories in China, and he was advised that his top factories had not received *any* sketches from Bowls for the Fall 2015 season, which revealed to Lang that Bowls stopped working long *before* he terminated his employment contract in September 2014. *See also* Supplemental Certification of Stephen N. Lang ("Supplemental Lang Certification") at ¶ 8. Bowls has historically been late submitting sketches for an upcoming season, but the fact that he did not submit sketches for the next season (Fall 2015) has placed Mon Cheri in a very precarious spot with its factories, retailers and ultimately customers. *See* Lang Certification at ¶ 26. In short, it has critically hampered Mon Cheri for the Fall 2015 season. *See* Supplemental Lang Certification at ¶ 8.

All of Mon Cheri's other designers -- Sophia Tolli, Joan Calabrese, James Clifford and Ivonne Dome, to name several -- submit their sketches for Lang's review, and then they are sent to the factories in China to make "samples" for editing, before final decisions are made for dresses to go "onto the line" (i.e. offered for sale to retailers in catalogs and through other media). For years, Bowls has refused to submit sketches to Lang, choosing instead (against Lang's wishes) to send them directly to the factory. The sketches for the Fall 2015 season should have been submitted to the factories by June 2014 to get samples made for editing for Fall 2015 (i.e. a full year before the season in which they are sold). Every one of Mon Cheri's other designers follows this schedule, even though (unlike Bowls) they are not employed, but are independent contractors. Because Lang just learned from his factories that Bowls failed to submit any sketches, considerable damage has been caused to Mon Cheri's ability to complete a successful line of evening dresses for the Fall 2015 season. This is a major issue for the company, which will negatively affect its reputation with vendors and retailers. *See* Lang Certification at ¶ 27.

14

At the same time that Bowls was failing to deliver on his obligations as a designer, he was pushing the company's investment as a sponsor of the Miss America Pageant. In April 2014, Mon Cheri, Bowls and the Miss America Organization ("MAO") entered into a contract (the "MAO Contract"), under which Mon Cheri and Bowls agreed to be a sponsor of the Miss America Pageant. *See* Lang Certification at ¶ 28. Lang was reluctant to pursue this investment, because Bowls' own actions had embroiled Mon Cheri in a dispute with MAO several years ago. In 2007, Bowls took pictures of the reigning Miss America wearing her crown, without any authorization from MAO. MAO complained to Mon Cheri, and the company was compelled to make a substantial payment and issue a public apology for Bowls' actions. *See* Lang Certification at ¶ 29. As a result, Lang was not initially supportive of the project, for this and other reasons. But Bowls pushed hard to do it, and Lang ultimately agreed. *See* Lang Certification at ¶ 30.

After Mon Cheri signed the MAO Contract, one of Bowls' responsibilities was to design distinct gowns for each of the Miss America contestants. He did so, and gowns were provided to each of the 53 contestants to wear during the competition. These gowns, which cost the company tens of thousands of dollars to manufacture, were to be *returned* to Mon Cheri after the pageant to be used for photo shoots to create the pageant line for Spring 2015. Without Lang's knowledge or approval, Bowls told MAO that the contestants could just keep the gowns. This has destroyed Mon Cheri's ability to create the pageant line for Spring 2015. Without the gowns, photo shoots cannot be done, and catalogs cannot be made, and hence retailers will not order the gowns for Spring delivery. Consequently, Mon Cheri will have no pageant product to sell in Spring 2015. The damage to Mon Cheri's reputation is incalculable. *See* Lang Certification at ¶ 31. Furthermore, Bowls greatly exceeded the budget for production of the gowns. Although the company approved a budget of $30,000, Bowls ultimately spent approximately $65,000 on

15

gowns, which he then "gave away" without the company's approval. *See* Lang Certification at ¶ 32.

Lang only recently learned that Bowls made deliberate decisions to routinely ignore the company budgets. He was intimately involved in the preparation of necessary budgets for the costs associated with producing his prom and other lines, as well as the budget for the Miss America pageant this year. As an employee, Bowls was obligated under paragraph 1.C of his Employment Agreement to abide by the budgets. Bowls was responsible for providing the company with a budget for the costs of travel, photographers and models for photo shoots for the product catalogs. Bowls has often run over his budgets, costing the company significant money. Lang recently learned from Roddy that Bowls was not concerned with complying with the budgets at all. Roddy advised Lang that Bowls did not even ask for quotes from certain vendors before committing to project costs, and would actually tell Roddy that he spent what he wanted because he knew that Mon Cheri "would just pay the bills". *See* Lang Certification at ¶ 33.

Roddy has confirmed that Bowls made a number of comments to him, which made it clear that Bowls intended to elevate his own image at the expense of Mon Cheri, and that he was not concerned about following any of the rules and restrictions Mon Cheri had in place for budgets and marketing plans. *See* Roddy Certification at ¶ 14. Furthermore, Bowls was frequently late for scheduled photo shoots, and also kept the photographers and models later in the day than the schedule permitted. Bowls also overbooked models and insisted on certain photographic equipment, which was never used. Roddy personally observed these facts because he was present for some of the shoots. Bowls told Roddy several times that he was not concerned about meeting the budgetary constraints imposed by Mon Cheri, because he "always got his money" back from the company. Indeed, Roddy was told by photographers that Bowls never

even asked them for a price quote before booking them. *See* Roddy Certification at ¶ 15.

Bowls also failed to capitalize on opportunities to promote the pageant dress line that arose from Mon Cheri's investment in the Miss America project. For example, Roddy presented an opportunity under which retailers who placed minimum orders at the Atlanta Market in August 2014 would have been entitled to a "trunk show" at their stores with an appearance from the pageant title holder from their State.  This opportunity would have generated more revenue from dress sales, but Bowls refused to go along with it, for unexplained reasons. *See* Lang Certification at ¶ 34. Roddy himself came to Mon Cheri at Bowls' insistence. Bowls introduced Mon Cheri to Roddy, and Bowls asked Lang to retain Roddy as Bowls' Brand Manager. Lang agreed to do so in April 2014. Mon Cheri committed significant dollars to Roddy, who was to report directly to Bowls and take direction from him on the development of social media and internet marketing strategies to improve the Mon Cheri/Tony Bowls branding for the many years remaining on the License Agreement. Despite making this substantial investment in a branding manager, not long after Roddy was retained, Bowls stopped communicating with him on an effective, professional level. *See* Lang Certification at ¶ 35.

Similarly, Roddy also experienced a number of additional issues in his efforts to work with Bowls to grow the brand. One of the most significant issues was Bowls' insistence that his name and image be the focal point for all marketing efforts. Roddy repeatedly explained to Bowls that the dress designs themselves -- not Bowls' name and face -- were more important (in his view) in developing the brand, but Bowls vehemently disagreed. Roddy explained to Bowls that his view was backed by the statistics, which demonstrated that images of Bowls' dresses without Bowls' face in them generated the most "comments/likes" on social media, but Bowls still disagreed. *See* Roddy Certification at ¶ 10.

17

Additionally, in April 2014, Bowls asked Roddy to take steps to remove the name of Mon Cheri's Sales Manager, Brian Egitto, from that portion of Mon Cheri's website that marketed the Tony Bowls collections, so that retailer inquiries would not be directed to Mr. Egitto. Bowls wanted the inquiries to go directly to him, rather than to Mr. Egitto. *See* Roddy Certification at ¶ 11. Subsequently, in May 2014, Roddy found a "mock" website to show Bowls, with Roddy's ideas on how best to reposition Bowls' image and his branding. Although Roddy asked for feedback and approval, Bowls not only failed to respond but refused to review it with Roddy, even though Roddy was getting paid to be his brand manager. *See* Roddy Certification at ¶ 12. Moreover, a significant turning point in their relationship occurred in June 2014. Bowls provided Roddy with a picture collage containing a picture of Bowls, which was larger than the dresses, and Bowls' name or "logo" in several different spots. When Roddy questioned the wisdom of emphasizing Bowls' own personal image and name above the product, Bowls became angry and this began a prolonged period of tension between them. *See* Roddy Certification at ¶ 13. From that point forward, Roddy's relationship with Bowls became increasingly strained. Roddy Certification at ¶ 14.

Bowls has uploaded images onto his Instagram account, without using the Mon Cheri logo or mentioning the company in any way. Roddy spent a considerable amount of time and effort (at Mon Cheri's expense) developing followers on Instagram for Bowls and the dresses he designs for Mon Cheri, using the account "@TonyBowls". When Roddy first became Bowls' Brand Manager, Bowls had less than 20,000 "followers" on this social media account. Roddy secured thousands of additional followers by repositioning and controlling his posts, and he did this in part by using the strength of the "Mon Cheri" name in the industry to drive traffic to Bowls' site. After they were successful in securing thousands of new "followers" for this

account, Bowls decided to change his own Instagram name to "@TonyBowls_" and brought his followers with him. This forced Roddy to rebuild the entire Instagram account "@TonyBowls" from scratch, at Mon Cheri's sole expense. Roddy Certification at ¶ 16.

Remarkably, Bowls also tried to convince Roddy to leave Mon Cheri. In a recent email exchange, Bowls suggested to Roddy that they both leave the company, and start a new line of dresses where Roddy would be the "lead" designer by name, but Bowls would be in the background actually designing the dresses. Roddy never responded to this suggestion. Roddy Certification at ¶ 17.

The previously described actions of Bowls over the last several months are a non-exhaustive list. Mon Cheri has suffered considerable damage as a result of these actions. In addition, a significant component of Mon Cheri's business with retailers is the designers' appearance at "trunk shows" around the country. For a retailer who commits to purchasing a significant volume of our dresses, Mon Cheri arranges to have the designer appear at a "trunk show" at the retailer's showroom, because that will help the retailer attract customers to the store. For many years, Bowls has made appearances at trunk shows. Bowls agreed in August 2014 to appear at several trunk shows with Mon Cheri's significant accounts, and these shows were then scheduled with the retailers based on his commitments. Weeks later, however, Bowls resigned, and is now seeking to terminate the License Agreement. Bowls' failure to commit to already scheduled trunk shows, including appearances at Terry Costa in Dallas, Fashions at Large in Overland Park, Florida, Bravura, Castle Couture and Glitz & Glamour, has damaged Mon Cheri's reputation with its major accounts. *See* Lang Certification at ¶ 36.

Based on the Termination Notice, Lang has been compelled to seek another designer to start the process of creating new prom and pageant dress lines. This will take a considerable

amount of time. Locating a new designer, acclimating that designer into the company's branding and business strategies, and creating a whole new "look", which is consistent with the company's branding and business strategies, will take many months, and quite possibly years. For example, when Bowls first started designing for the company's prom division, the prom dresses had been created by another designer (Ivonne Dome). Ms. Dome's designs were unique to her creative style, and making that transition to Bowls' style took years to complete before his line of prom dresses became a successful line for Mon Cheri. *See* Lang Certification at ¶ 37. Consequently, if Bowls is permitted to move forward with the termination of the License Agreement, Mon Cheri will suffer immediate damage to its reputation in the business, because the company will be unable to quickly transition to a new designer. The effects will be irreparable and catastrophic. *See* Lang Certification at ¶ 38.

The damage to the company's reputation will likely occur in several ways. First, retailers who have already purchased dresses may cancel their orders. *See* Lang Certification at ¶ 39. Orders for Spring 2015 dresses are still being placed now and they continue to be manufactured in Mon Cheri's factories in China. *See* Supplemental Lang Certification at ¶ 9. Second, retailers who have committed to the company's Tony Bowls dress lines may lose confidence in Mon Cheri as a company, and scale back their future purchases of the company's other lines, creating a "run on the bank" effect. Lang has seen this happen with other companies in his over 30 years in the business. This type of harm to Mon Cheri's standing in the industry as a solid company would be incalculable. Third, the timing of Bowls' Termination Notice could not be worse for the company. For example, only recently did Mon Cheri enter into the MAO Contract, which committed the company to a certain level of support for the Miss America pageant. However, that support was inextricably linked to Bowls' design of the pageant dresses. Now that Bowls is

20

threatening to terminate the License Agreement, a full termination would create a perception among young women, and the public, that Mon Cheri is no longer committed to the Miss America pageant. That situation would be a public relations debacle for the company. *See* Lang Certification at ¶ 39.

Following receipt of Bowls' October 10, 2014 "Termination Notice", and within the 30-day notice period, Mon Cheri timely filed an Order to Show Cause application for Temporary Restraints and a Preliminary Injunction before the Honorable Paul Innes, P.J.Ch. in the Superior Court of New Jersey. Bowls' counsel received a copy of the application for restraints when it was filed, on November 7, 2014, but for whatever reason he chose not to submit any papers in opposition to the application, or request a hearing. Accordingly, on December 3, 2014, Judge Innes entered the TRO and set the return date for the application for February 13, 2015. Bowls filed a motion to vacate the TRO on December 18, 2014, which was heard and decided by Judge Innes on December 22, 2014. After hearing oral argument, Judge Innes denied Bowls' motion, extended the TRO until the February hearing date and ordered expedited discovery. In reaching his ruling, Judge Innes considered each of the traditional factors for the issuance of injunctive relief -- including irreparable harm -- and concluded that the factors weighed in favor of continuing the temporary restraints. *See* Transcript of Hearing, attached to correspondence of 1/15/15 at ECF Docket # 15 (hereafter "12/22/14 Tr.").

Specifically, Judge Innes indicated that he was "most concerned with maintaining the status quo, that is maintaining the rights and obligations with regard to the license agreement entered into freely and voluntarily by the parties in this matter." *See* 12/22/14 Tr. at T48:5-8. In evaluating the possible irreparable harm to Mon Cheri, Judge Innes advised that "the Court [was] very concerned with the intangibles, that is the business and goodwill which may befall the

21

plaintiff if the license agreement is unlawfully terminated by the defendant." *Id.* at T50:2-5. Judge Innes further held that "clearly there's enough evidence here to demonstrate that the defendant may have breached this contract in this case." *Id.* at T51:11-13. Judge Innes also concluded that there were no material disputes of fact that would preclude the relief sought by Mon Cheri. *Id.* at T51:19-20. Finally, Judge Innes found that Mon Cheri had a strong interest in having the limited injunctive relief granted, and that Bowls had not sufficiently demonstrated that his interests outweighed Mon Cheri's interests. *Id.* at T52:15-22. Instead, Judge Innes noted that Bowls could still engage in design work, and the Court rejected the argument that Bowls would suffer significant monetary damage because he was still receiving royalties due under the License Agreement. *Id.* at T52:15-53:5. *See also* Supplemental Lang Certification at ¶6. Contrary to Bowls' assertions, Bowls may continue to work as a designer in the industry; he simply cannot design under his own name or design products which compete with the product lines he designed for Mon Cheri. *See* Supplemental Lang Certification at ¶ 5. In essence, Judge Innes converted the TRO into a preliminary injunction by conducting such an in-depth analysis. Following Judge Innes' ruling in Mon Cheri's favor, Bowls removed the case to this Court on December 30, 2014.

## **LEGAL ARGUMENT**

The power of this Court to issue a preliminary injunction is well-settled in cases in which a party seeks emergent, temporary, interlocutory, or other interim relief. *Fed. R. Civ. P.* 65(a). "The overriding purpose of a preliminary injunction is to preserve the status quo in anticipation of trial." *Connors v. Shannopin Mining Co.*, 675 *F. Supp.* 986, 991 (W.D. Pa. 1987). Preliminary injunctions may be granted to enforce non-compete agreements. *See e.g., BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 *F.3d* 254 (3d Cir. 2000); *Arch Pers. Care Prods., L.P. v. Malmstrom*, 90 *Fed. Appx.* 17 (3d Cir. 2003). The party seeking the injunction must show:

(1)     denial will result in irreparable harm to the plaintiff;

(2)      the plaintiff is likely to succeed on the merits;

(3)     granting the injunction will not result in irreparable harm to the defendant; and

(4)     granting the injunction is in the public interest.

*Nutrasweet Co. v. Vit-Mar Enters.*, 176 *F.3d* 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 *F.3d* 179, 184 (3d Cir. 1998)); *see Kos Pharms., Inc. v. Andrx Corp.*, 369 *F.3d* 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 *F.3d* 153, 158 (3d Cir. 1999)); *S & R Corp. v. Jiffy Lube International, Inc.*, 968 *F.2d* 371 (3d Cir. 1992); *Hoxworth v. Blinder, Robinson & Co.*, 903 *F.2d* 186 (3d Cir. 1990); *Jiffy Lube Int'l v. Weiss Bros.*, 834 *F. Supp.* 683 (D.N.J. 1993). While the burden rests upon the moving party to show irreparable harm and a likelihood of succeeding on the merits, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 *F.2d* 797, 800 (3d Cir. 1989) (quoting *In Re Arthur Treacher's Franchisee Litigation*, 689 *F.2d* 1137, 1143 (3d Cir. 1982) (citations omitted).

**I.      Mon Cheri Is Entitled to a Preliminary Injunction**

**a.  Failure to Grant Mon Cheri's Application Will Result in Irreparable Harm**

In order to demonstrate irreparable harm, Mon Cheri "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 *F.2d* 86, 91 (3d Cir. 1992) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 *F.2d* 797, 801 (3d Cir. 1989); *Weinberger v. Romero-Barcelo*, 456 *U.S.* 305 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 *F.2d* 351, 356 and n. 9 (3d Cir. 1980).

This element is met here because the harm to Mon Cheri, if Bowls is permitted to unlawfully terminate the License Agreement, cannot be redressed adequately by monetary damages.

Supporting this conclusion, the Third Circuit has noted "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill..." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 *F.2d* 371, 378 (3d Cir.1992) (internal citations omitted). Additionally, various courts interpreting New Jersey law have stated that "the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of a preliminary injunction." *Atlantic City Coin  Slot Co., Inc. v. IGT*, 14 *F. Supp.2d* 644, 667 (D.N.J. 1998)(quoting *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 *F. Supp.* 233 (D.N.J.1976)). In fact, the New Jersey Supreme Court has specifically ruled that the loss of business and/or business opportunity constitutes irreparable harm sufficient to warrant preliminary relief:

> The object of a preliminary injunction is to prevent some threatening, irreparable mischief which should be averted pending a full and deliberate investigation of the case, **and acts which destroy a complainant's business, custom and profits are in this category and authorize the issuance of a preliminary injunction.**

*Sunbeam Corp. v. Windsor-Fifth Avenue*, 14 *N.J.* 222, 233 (1953) (emphasis added).

Here, Bowls has wrongly attempted to terminate the License Agreement with Mon Cheri. In response, Mon Cheri seeks precisely what injunctive relief is intended to do – "maintain the parties in substantially the same condition 'when the final decree is entered as they were in when the litigation began.'" *Peters v. Public Service Corp. of N.J.*, 132 *N.J. Eq.* 500 (Ch. 1942). While the litigation proceeds, the parties should be placed on a level playing field and *status quo* maintained.

The 3rd Circuit aptly described the justification for the "status quo" standard as the "need to protect the integrity of the applicable dispute resolution process". *Ortho Pharm. Corp. v.*

24

*Amgen, Inc.,* 882 F.2d 806, 814 (3d Cir. 1989). In other words, the goal of such preliminary relief is to "attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing". *Id.  See also Hamilton Watch Co. v. Benrus Watch Co., Inc.,* 206 F.2d 738, 742 (2d Cir. 1953)(an interlocutory injunction "serves as an equitable policing measure to prevent the parties from harming one another during the litigation" and "to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began").

If Bowls is permitted to terminate the License Agreement at this time, Mon Cheri will suffer immediate damage to its reputation in the business, because the company will be unable to quickly transition to a new designer. Retailers who have already purchased dresses may cancel their orders. Additionally, retailers who have committed to the company's Tony Bowls dress lines may lose confidence in Mon Cheri as a company, and scale back their future purchases of the company's other lines, creating a "run on the bank" effect. Moreover, the timing of Bowls' Termination Notice could not be worse for the company as Mon Cheri just recently entered into a contract with the Miss America Organization to have Bowls design pageant dresses under the "Mon Cheri/Tony Bowls" banner. A license termination would create a perception among young women and the public that Mon Cheri is no longer committed to the Miss America pageant, which would be a public relations debacle for the company. Essentially, the effects of Bowls terminating the License Agreement will be catastrophic. As such, absent the injunctive relief requested, Mon Cheri will suffer immediate and irreparable harm.

### b.  Mon Cheri has Shown a Reasonable Probability of Success on the Merits

In addition to irreparable harm, a plaintiff must show a reasonable probability of success on the merits to secure a preliminary injunction. *See Nutrasweet Co.* 176 *F.3d* at 153; *Crowe v.*

*De Gioia*, 90 *N.J.* 126, 133 (citing *Citizens Coach Co. v. Camden Horse R.R. Co.*, 29 *N.J. Eq.* 299, 305-06 (E. & A. 1878)). "To succeed on its application for a preliminary injunction, [Mon Cheri] must show a reasonable likelihood of success on the merits, as determined in the context of the presumptions and burdens that would inhere at trial." *Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*, 2007 U.S. Dist. LEXIS 65792 (D.N.J. Sept. 6, 2007) (citing *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 *F.2d* 384, 388-90 (Fed. Cir. 1987)).

The Certifications of Stephen Lang and Steven Roddy, and the Supplemental Lang Certification, demonstrate a reasonable probability that Mon Cheri can prove that Bowls has improperly repudiated the License Agreement. Simply stated, Mon Cheri seeks to prevent the unlawful, early termination of a License Agreement and from taking any action that interferes with Mon Cheri's rights under the License Agreement. Mon Cheri has fulfilled all of its obligations under the License Agreement, which include paying Bowls royalties due under the contract and investing millions of dollars to manufacture, advertise and market Bowls' dresses to customers around the world. In contrast, Bowls has breached several of his duties and responsibilities under both agreements, including but not limited to failing to submit sketches to Mon Cheri's factories in time for production for the Spring 2015 season; permitting each of the 53 Miss America contestants to keep the gowns manufactured by Mon Cheri, without the company's authorization; failing to adhere to the company's budget for the costs associated with producing his prom and other lines, as well as the budget for the 2014 Miss American pageant; failing to capitalize on opportunities to promote the pageant dress line, which arose from the company's investment in the Miss America project; refusing to cooperate with his own brand manager, Roddy, whom Bowls urged Mon Cheri to hire; and attempting to compete with Mon Cheri by trying to convince Roddy to be his ghost designer.

Based on the foregoing, Mon Cheri has shown a reasonable probability of success on the merits of its claims.

### c. Granting Injunctive Relief Would Not Result in Irreparable Harm to Bowls

Injunctive relief should be awarded where the hardship to one party exceeds that to the other. *Nutrasweet Co.*, 176 *F.3d* at153. This balancing test requires the Court to take into account the relative hardships to the parties of the grant of equitable relief.

Here, the balancing of the hardships clearly favors the issuance of a preliminary injunction because the harm to Mon Cheri in the absence of equitable relief far outweighs any detriment to Bowls from the limited injunction sought by the company. As evidenced above, allowing Bowls to terminate the License Agreement early will cause significant damage to Mon Cheri's reputation and the goodwill built under the Licensed Marks through years of work. Additionally, dresses are still being ordered and manufactured for Mon Cheri for the Spring 2015 line. In contrast, Bowls will not suffer any hardship by allowing Mon Cheri to continue to market and sell the Licensed Marks because he will continue to receive all royalties and his brand will continue to be promoted. Moreover, Bowls may continue to work as a designer in the industry; he simply cannot design under his own name or design products which compete with the product lines he designed for Mon Cheri. It is hardly any hardship to Bowls to require that he abide by the contract into which he freely entered. He is still enjoying the fruits of that contract today, in the form of substantial royalty payments.

Therefore, Mon Cheri submits, that while it will suffer a grave and irreparable hardship if the requested relief is not granted, there would be no tangible hardship whatsoever to Bowls.

### d. Public Interest Clearly Favors Granting Injunctive Relief to Mon Cheri

As the final factor in the analysis, the Court "must consider whether others might be

27

harmed and whether such an action is in the public interest." *Local 397, International Union of Electronic, etc. v. Midwest Fasteners, Inc.*, 763 *F. Supp.* 78, 84 (D.N.J. 1990). In the context of a breach of contract dispute, "the public interest favors enforcing valid contracts and making parties live up to their agreements." *Bioquell, Inc. v. Feinstein*, 2011 U.S. Dist. LEXIS 16081 (E.D. Pa. Feb. 14, 2011). *See Siemens Building Technologies. Inc. v. Camacho*, 168 *F. Supp.* 2d 425, 2001 WL 395294, *2 (E.D. Pa. 2001) (noting that it is in the public interest to enforce valid contracts and protect legitimate business interests).

Ample precedent underscores this point. Particularly illustrative is *Score Board v. Upper Deck Co.*, 959 *F. Supp.* 234, 240 (D.N.J. 1997) In *Score Board*, a plaintiff sought a preliminary injunction barring defendants from selling items autographed by a baseball star to retail companies. A dispute arose out of a "Player Highlight Agreement" between Score Board and the Major League Baseball Players Association ("MLBPA"), pursuant to which the MLBPA granted Score Board a license to commercialize the indicia of Major League Baseball player Ken Griffey, Jr. ("Griffey"). *Id.* at 236. Griffey agreed to autograph certain items for Score Board to sell and, in return, Score Board agreed to pay Griffey a minimum guaranteed sum. *Id.* at 236-237. Score Board also limited Griffey's right to sell his autograph elsewhere. *Id.* at 237. Subsequently, a competitor to Score Board began to sell Griffey items, in violation of the agreement, resulting in orders being canceled from Score Board. *Id.* In response, Score Board applied for an order to show cause why a preliminary injunction should not be issued enjoining the competitor from selling Griffey items. *Id.* After considering all of the factors, the court granted Score Board's request for a preliminary injunction. *Id.* at 240-241. With respect to the public interest analysis, the court opined:

> [T]he entry of an injunction is clearly in the public interest, even though this is a private dispute. It will prevent one company from interfering with the legally

28

> protected contractual rights of another. Additionally, it will set a precedent that
> may deter similar interference in the future, particularly in a highly competitive
> sports memorabilia industry in which the contractual relationship is the coin of
> the realm.

*Id.* at 240.

Here, the public interest clearly favors granting Mon Cheri's application. The parties entered into the License Agreement in 2011 voluntarily and freely. Despite Mon Cheri fulfilling its duties and obligations under the License Agreement, Bowls has repeatedly breached his responsibilities and is now attempting to unlawfully terminate the License Agreement. Similar to *Score Board*, it is necessary to prevent Bowls from interfering with the legally protected contractual rights of Mon Cheri. Obviously, it is in the public interest to protect the reputation and livelihood of one of the largest manufacturers and wholesalers of wedding dresses and special occasion wear in the United States – a highly competitive industry.

## CONCLUSION

For the foregoing reasons, Mon Cheri's application should be granted and the Court should order the limited equitable relief sought to preserve the status quo, pending a trial on the merits.

Respectfully submitted,

STARK & STARK
A Professional Corporation

By: _____
    CRAIG S. HILLIARD

29