**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MON CHERI BRIDALS, LLC,

              Plaintiff,

v.

TONY BOWLS,

              Defendant.

Civil Action No. 14-8107 (MAS) (LHG)

**OPINION**

**SHIPP, District Judge**

    This suit involves a dispute between a dress manufacturer and one of its designers. Plaintiff Mon Cheri Bridals, LLC ("Plaintiff" or "MCB") is a manufacturer and wholesaler of dresses for weddings and other special occasions. MCB brings suit against Tony Bowls ("Defendant" or "Bowls"), a former employee of the company and designer of its prom and pageant dresses. In the course of the parties' relationship, Bowls granted MCB an exclusive license to use his trademark, "Tony Bowls." MCB claims that Bowls wrongfully attempted to terminate that arrangement.

    The matter comes before the Court on Plaintiff's application for a preliminary injunction. (ECF Nos. 1, 17.) Defendant has opposed the application (ECF Nos. 11, 20) and filed a cross-motion for an accounting (ECF No. 21), and Plaintiff replied (ECF No. 28). The Court has carefully considered the parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, MCB's application for a preliminary injunction is denied, the existing temporary restraining order is dissolved, and Bowls' cross-motion for an accounting is denied.

I.      **Background**

As noted, the parties' relationship is one of a manufacturer and designer. MCB engaged Bowls as a designer in February 2005. (Notice of Removal, Ex. B., Verified Compl. ¶ 9, ECF No. 2.) In or around October 2011, MCB and Bowls negotiated two agreements relevant to the dispute at issue—an agreement governing Bowls' employment ("Employment Agreement") and an agreement governing Bowls' grant of an exclusive license to use his trademark, "Tony Bowls," ("Licensed Mark") and MCB's concomitant duty to pay royalties to Bowls ("License Agreement"). (*Id.* ¶¶ 10-11.) Specifically, Bowls, in the License Agreement, "grants to MCB an exclusive, world-wide, license to use the Licensed Mark[]" for a ten-year term, expiring in 2021. (Certification of Stephen Lang ("Lang Cert."), Ex. B ("License Agreement") ¶¶ 2.1, 7.1, ECF No. 17-3.) MCB is required to pay royalties to Bowls "monthly within twenty-five (25) days of the end of the applicable month." (*Id.* ¶ 3.)

The terms of the License Agreement impose certain duties on MCB's use of the Licensed Mark. For example, "MCB may not use the Licensed Mark[] in a form and manner or for a subject matter that would or could reduce [its] value." (*Id.* ¶ 5.1.) The License Agreement also requires that MCB use the Licensed Mark whenever a related product line appears in any form of media. (*Id.*)[1] The License Agreement also requires that MCB "include on all website pages on which any of the Dresses[2] are mentioned or offered for sale the appropriate trademark notice." (*Id.* ¶ 5.3.)

---

[1] "When the various product lines which use the Licensed Mark[] are used in any media, the entire product line name, including the Licensed Mark[] must be used (ie. [sic] "Tony Bowls Paris" rather than "Paris", etc . . .)." (*Id.*)

[2] Dresses are defined by the License Agreement as "Prom dresses, Evening Dresses, Pageant Dresses, Wedding Dresses, and Junior Prom Dresses." (*Id.* ¶ 1.)

2

The License Agreement also spells out when Bowls may terminate the arrangement.[3] For instance, if certain benchmarks are not satisfied (e.g., marketing budget expenses), Bowls is entitled to terminate. (*Id.* ¶ 7.3(a).) Bowls is also allowed to terminate on thirty-days' notice if the Employment Agreement is terminated and one of several conditions, which are expressly deemed material breaches, is satisfied. Of particular relevance here, Bowls may terminate, in that context, if either: "[1] MCB ceases to use its best efforts to market commercially reasonably [sic] Dresses using the Licensed Mark[] and to preserve and promote the good reputation of the Licensed Mark[] within the marketplace; . . . [or] [2] MCB markets prom or pageant dresses in any manner not using the Licensed Mark[]." (*Id.* ¶ 7.3(b)(ii), (v).)

The parties' relationship appears to have remained amicable until the fall of 2014. On September 16, 2014, Bowls wrote MCB notifying it that he was resigning from his employment.[4] (Verified Compl. ¶ 21.) Then, on October 10, 2014, Bowls sent correspondence to MCB claiming that it breached the License Agreement and, as a result, Bowls was terminating the License Agreement effective November 10, 2014 ("Termination Notice"). (*Id.* ¶ 20.) On November 7, 2014, MCB filed a verified complaint and order to show cause in the Superior Court of New Jersey, Chancery Division, Mercer County, docket number C-98-14, requesting a temporary restraining order and preliminary injunction. (*See generally* Notice of Removal, Ex. B.) On December 3, 2014, the Honorable Paul Innes, P.J. Ch., granted MCB's request for a temporary restraining order

---

[3] Because only the propriety of Bowls' efforts to terminate are at issue, only those portions of the License Agreement are relevant to this discussion.

[4] The Employment Agreement states that Bowls may terminate his employment "upon written notice sent to [MCB] from [Bowls] stating that [Bowls] is electing to terminate his employment." (Lang Cert., Ex. A ("Employment Agreement") ¶ 10(A)(ii), ECF No. 17-2.) Plaintiff does not challenge Bowls' termination of the Employment Agreement.

3

and enjoined Bowls from terminating, or taking action to terminate, the License Agreement ("TRO"). (*See id.*)

Prior to resolution of the request for preliminary injunction, Defendant removed the case to this Court. On January 16, 2015, the Court determined that, under Rule 65(b), the TRO had expired but, on application from Plaintiff, the Court found good cause to extend the TRO pending the resolution of the instant application. (ECF No. 16.)

## II.  Legal Standard

Rule 65 of the Federal Rules of Civil Procedure governs the imposition of injunctive relief in federal court. Rule 65 "empowers district courts to grant preliminary injunctions." *Doe v. Banos*, 713 F. Supp. 2d 404, 410 (D.N.J.), *aff'd*, 416 F. App'x 185 (3d Cir. 2010). "Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). Injunctive relief is inappropriate "when the moving party has an adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (internal quotation marks omitted). In determining whether to grant preliminary injunctive relief, courts look to several factors:

> [a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These equitable factors are just that—factors to be balanced against one another. All of these factors need not be considered by the Court, if the factors considered are dispositive; however, an injunction shall not issue absent a showing of both a likelihood of success on the merits and a likelihood of irreparable harm. *Id.* at

22; *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90-91 (3d Cir. 1992). The moving party, MCB, bears the burden of showing entitlement to injunctive relief. *Ferring Pharm.*, 765 F.3d at 210. The Court may properly consider both the allegations of Plaintiff's Verified Complaint and supporting affidavits in determining the suitability of a preliminary injunction. *See Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.*, 715 F. Supp. 616, 624 n.14 (D.N.J. 1989); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

### III. Preliminary Injunction

#### A. Likelihood of Success on the Merits

Plaintiff asserts essentially one cause of action—breach of contract, namely the License Agreement—and requests both injunctive and declaratory relief. (Verified Compl. ¶¶ 29-46.) Plaintiff claims that it never breached the License Agreement and, therefore, Bowls' efforts to terminate it constitute a wrongful repudiation and breach. As a result, the Court must determine whether Plaintiff has established that it is likely to succeed on its claim that Bowls breached the License Agreement—or to put it another way, MCB must establish that it is likely that it did not first breach the License Agreement, rendering Bowls' repudiation wrongful.

In making this determination, certain principles of contract law apply. "If the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014).[5] "New Jersey law recognizes that a material breach of contract on the part of one party entitles the other party to terminate it." *In re Rappaport*, 517 B.R. 518, 533 (Bankr. D.N.J. 2014) (citing *Ross Sys. v. Linden Dari-Delite*, 35 N.J. 329 (1961)); *accord Gen. Motors Corp. v. New A.C. Chevrolet,*

---

[5] The License Agreement states that "[t]he internal law of the State of New Jersey . . . will govern all questions concerning the construction, validity, and interpretation of the Agreement and the performance of the obligations imposed by this Agreement." (License Agreement ¶ 9.3.)

*Inc.*, 263 F.3d 296, 315 n.5 (3d Cir. 2001) ("It is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of either continuing the contract and suing for partial breach, or terminating the agreement in its entirety."). New Jersey courts have deferred to a contract's definition of what constitutes a material breach. *See Luma Enters., L.L.C. v. Hunter Homes & Remodeling, L.L.C.*, No. L-5620-10, 2013 WL 3284130, at *4 (N.J. Super. Ct. App. Div. July 1, 2013); *see also In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 624 (3d Cir. 2005) (deferring to a contract's definition of materiality). Regardless of contractual definition, "[a] breach is material if it goes to the essence of the contract." *See In re Rappaport*, 517 B.R. at 533 (citing *Ross Sys.*, 35 N.J. at 341).

Bowls asserts several grounds in support of his contention that Plaintiff breached the License Agreement. Without providing a review of every asserted basis, the Court will address those asserted bases that have the most support in the materials submitted to the Court. For one, Bowls states that MCB marketed prom and pageant dresses, designed by Bowls, without the use of the Licensed Mark. As discussed, the License Agreement states that MCB commits a material breach, and Bowls may then terminate the agreement, if "MCB markets prom or pageant dresses in any manner not using the Licensed Mark[]." (License Agreement ¶ 7.3(b)(v).) Bowls contends that MCB has marketed dresses designed by Bowls on various forms of social media without the Licensed Mark and that these marketing efforts violate the terms of the License Agreement. (Certification of Tony Bowls ¶¶ 37-38, 43, 46, 51, 61, ECF No. 10 ("Bowls Cert. I").) For instance, Bowls has provided an example where MCB posted an image of a model wearing a dress designed by Bowls on Instagram[6]; the post does not contain any reference to Bowls or the Licensed Mark.

---

[6] As described by Bowls, "Instagram is a social media website where photographs and short video clips are posted and shared with other account holders." (Bowls Cert. I ¶ 49.)

(Supplemental Certification of Tony Bowls ¶ 23, ECF No. 20-1 ("Bowls Cert. II"); Bowls Cert. II, Ex. 17, ECF No. 20-4.) MCB responds stating that "the License Agreement . . . does not contemplate using Bowls' Licensed Mark on every single photograph or post [on social media], particularly when [MCB] does not sell prom or pageant dresses by any other designer." (Reply Br. 12-13, ECF No. 28.) MCB does not, however, dispute that it has posted images without the Licensed Mark or that the use of Instagram constitutes marketing.

Bowls also claims that MCB violated the License Agreement by failing to fulfill obligations related to potential third-party infringement of the Licensed Mark. Under the License Agreement, both MCB and Bowls have obligations and rights related to potential infringements of the Licensed Mark, including the joint obligation to notify each other of potential infringement and Bowls' first right to pursue an infringement suit. (License Agreement ¶ 8.3.) Bowls asserts that MCB did not provide notice of potential infringement, nor allow him to first file suit against those potential infringements. (Bowls Cert. I ¶¶ 82-86.) MCB has not rebutted these assertions.

Based on the materials presented to the Court, Plaintiff has not established a likelihood of success on the merits. One of the provisions of the License Agreement at issue, governing Bowls' ability to terminate based on marketing without the Licensed Mark, is broad: "Bowls may terminate this Agreement . . . in the event . . . MCB markets prom or pageant dresses *in any manner not using the Licensed Mark*[]."[7] (License Agreement ¶ 7.3(b) (emphasis added).) Bowls has presented evidence tending to show that MCB did indeed market prom dresses without using the Licensed Mark. Both MCB and Bowls refer to the MCB's use of social media platforms, such as Instagram, as marketing or advertising. Further, MCB has not countered Bowls' claim that it failed

---

[7] The License Agreement states that "[t]he language used herein, unless defined specifically, shall be construed according to its reasonable and customary meaning in the United States." (License Agreement ¶ 9.5.)

to notify him of potential infringement of the Licensed Mark or failed to give him first right to bring legal action against potential infringers. Accordingly, this factor weighs in favor of denying Plaintiff's application for a preliminary injunction.

### B. Likelihood of Irreparable Harm Absent an Injunction

Plaintiff must also establish that there is a likelihood that it will suffer irreparable harm should the Court not grant its application. "It is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Morales*, 504 U.S. at 381 (internal quotation marks omitted). Plaintiff must show that a legal remedy or a final equitable remedy is insufficient. "The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Where a plaintiff has suffered "the temporary loss of income" or may be made whole by money damages, injunctive relief should not be granted. *Id.* at 801 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1964)).

> In determining whether a remedy in damages for a breach of contract would be adequate the following circumstances are significant: (a) the difficulty in proving damages with reasonable certainty, (b) the difficulty in procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected.

*Id.* at 801-02.

In *Instant Air Freight*, the Third Circuit held that there was no irreparable harm where the defendant terminated a contract and a longstanding business relationship with plaintiff, a company providing air freight handling services, because any resulting harm from the termination of the parties' contract could be estimated based on the prior business generated through the relationship. *Id.* at 798, 802. There, the lower court found there was irreparable harm because the plaintiff "will lose the main portion of its business . . . and its goodwill and reputation in the industry"; eighty

percent of the plaintiff's business was devoted to the defendant. *Id.* at 798-99. The Third Circuit nonetheless reversed finding that those injuries could be quantified. *Id.*

Here, Plaintiff's alleged injury can similarly be remedied by money damages. Plaintiff states that it "will suffer immediate damage to its reputation in the business, because the company will be unable to quickly transition to a new designer"—"[r]etailers who have already purchased dresses may cancel their orders." (Pl.'s Moving Br. 25, ECF No. 17.) Plaintiff also claims that Defendant's alleged wrongful termination will do harm to the company's goodwill with its customers and the industry. (*Id.*) These kinds of injury, however, are precisely the harm proffered and rejected in *Instant Air Freight*. Any losses suffered due to cancelled orders are easily quantifiable, and, should Plaintiff succeed in establishing the liability of Defendant, it will be able to present all manner of evidence in support of damages to its business reputation, including expert testimony. Plaintiff invokes *S&R Corp. v. Jiffy Lube International, Inc.*, for the proposition that a finding of irreparable injury can be supported by "loss of control of reputation, loss of trade, and loss of goodwill." 968 F.2d 371, 378 (3d Cir. 1992) (citing *Opticians Assoc. of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990)). Cases such as *S&R Corp.* and *Opticians* are readily distinguishable: this line of cases relies on special harms inherent in claims of trademark infringement. *See id.* at 378; *Opticians*, 920 F.2d at 195-96 ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." (citing 2 J. McCarthy, *Trademarks & Unfair Competition* § 30:18 (2d ed. 1984))). Accordingly, Plaintiff's reference to this line of cases is not persuasive in light of the precedent in *Instant Air Freight*, an analogous breach of contract case, and this factor also weighs in favor of Defendant.

### C. Balance of Equities and the Public Interest

Plaintiff's failure to establish either a likelihood of success on the merits or irreparable harm requires a denial of its application. *Campbell Soup Co.*, 977 F.2d at 90-91. Accordingly, the Court need not address the remaining factors applicable to a preliminary injunction determination. The Court notes, however, that, in this case, the public interest is likely not implicated, as the dispute centers on distinctly private concerns.

### IV. Accounting

As noted, Defendant has cross moved for an accounting. "As a threshold matter, an accounting is an equitable remedy. In order to be entitled to an equitable remedy, it must be shown that there is no adequate remedy at law." *In re U.S. Mortg. Corp.*, 491 B.R. 642, 670 (Bankr. D.N.J. 2013) (citing *Rainbow Apparel, Inc. v. KCC Trading, Inc.*, No. 09-5319, 2010 WL 2179146, at *6-7 (D.N.J. May 26, 2010)). Bowls has not shown that legal remedies are inadequate—the conclusory statements to that effect contained in Defendant's brief are insufficient—and thus has not established an entitlement to an accounting. The cross-motion is denied.

### V. Conclusion

For the above reasons, MCB's application for a preliminary injunction is denied. As a result, the existing temporary restraining order is dissolved. In addition, Bowls' cross-motion for an accounting is denied. An order reflecting this decision will follow.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: March 25th, 2015

10